UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMMANUEL MFON,

                              Plaintiff,

        -v-

COUNTY OF DUTCHESS, et al.,

                              Defendants.

No. 14-CV-6922 (KMK)

OPINION & ORDER

Appearances:

William Greenberg, Esq.
The Greenberg Law Firm, LLP
Purchase, NY
*Counsel for Plaintiff*

David L. Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Emmauel Mfon ("Plaintiff"), a citizen of Sierra Leone, brings the instant Action

against the County of Dutchess and Dutchess County Sheriff's Department ("Defendants"),

alleging that Defendants' gross negligence and recklessness during a police pursuit were the

proximate cause of a car accident that resulted in injuries to Plaintiff. (*See* Compl. (Dkt. No. 1).)

Before the Court are Defendants' Motion for Summary Judgment and Motion To Strike the

Affidavit of Gareth Jones (the "Motions"). (Dkt. Nos. 32, 52.) For the reasons to follow, both

Motions are granted.

## I.  Background

### A.  Factual Background

On May 10, 2014, Deputy Jeffrey Basler ("Basler") was the road patrol deputy working the midnight to 8:00 a.m. shift in Zone 5, which includes the Towns of Beekman and Unionvale. (Defs.' 56.1 Statement ("Defs.' 56.1") ¶¶ 5–6 (Dkt. No. 47).)[1]  Basler has been a road patrol deputy in the Dutchess County Sheriff's Office for 13 years.  (*Id.* ¶ 9; Pl.'s Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 9 (Dkt. No. 46).)  That night, Sergeant Everett Pearsall ("Pearsall") was Basler's shift supervisor.  (Pl.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Pl.'s 56.1") ¶¶ 29, 31 (Dkt. No. 46).)[2]  At approximately 12:30 a.m. on May 10, 2014, Basler was en route to begin his shift patrolling Zone 5 when he first encountered a dual-wheeled pick-up truck operated by Jonathan Besze ("Besze").  (Defs.' 56.1 ¶¶ 7, 15; Pl.'s 56.1 Resp. ¶ 15.)  After encountering the Besze vehicle, Basler pursued it from Noxon Road into the Town of Poughkeepsie and then into the City of Poughkeepsie.  (Defs.' 56.1 ¶ 8.)  When Basler first saw the Besze vehicle around 12:30 a.m., it was "sliding sideways onto Noxon Road from Patrick Lane passing through a stop sign without signaling," (Defs.' 56.1 ¶ 14; Pl.'s 56.1 Resp. ¶ 14), and each of the inner rear tires was flat, (Defs.' 56.1 ¶ 15; Pl.'s 56.1 Resp. ¶ 15).  Defendants assert—and Plaintiff disputes—that Besze's vehicle nearly collided with a passenger vehicle proceeding southbound on Noxon Road.  (Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)  It is

---

[1] Defendants originally filed a Rule 56.1 Statement that omitted ¶¶ 4–8.  (*See* Dkt. No. 33.)  Defendants thus filed an amended statement, (Dkt. No. 47), and although Plaintiff identifies the omission in the original submission, Plaintiff did not file a response to the amended submission.  Accordingly, the Court assumes Plaintiff does not dispute those statements.

[2] Pearsall has since been promoted to the position of Lieutenant.

undisputed that at the time of the pursuit, the roads over which it took place were clear and dry and there was no precipitation.  (Defs.' 56.1 ¶¶ 12–13; Pl.'s 56.1 Resp. ¶¶ 12–13.)

Upon observing the Besze vehicle, Basler activated his overhead lights and siren with the intention of stopping the vehicle as a result of its violations of the Vehicle and Traffic Law and for reckless operation.  (Defs.' 56.1 ¶ 17; Pl.'s 56.1 Resp. ¶ 17.)[3]  The Besze vehicle continued southbound for a couple of hundred yards, made a left turn off the road onto the lawn of a property abutting an intersection, and cut across the property and re-entered the road, continuing northbound.  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.)  Basler then radioed the Sheriff's Office and advised that he had a "failure to comply" and provided his location, direction of travel, and speed.  (Def.'s 56.1 ¶ 21; Pl.'s 56.1 Resp. ¶ 21.)  The speed limit on Noxon Road is 45 mph and Besze was traveling 50 mph.  (Defs.' 56.1 ¶¶ 22–23; Pl.'s 56.1 Resp. ¶¶ 22–23.)  Deputy Wittek ("Wittek") was driving on Route 55 after his 4:00 p.m. to midnight tour of duty when he heard Basler's radio transmissions regarding the "failure to comply," and joined Basler in the pursuit of Besze.  (Defs.' 56.1 ¶¶ 30–31; Pl.'s 56.1 Resp. ¶¶ 30–31.)  After observing Besze's vehicle, Basler formed the opinion that Besze was intoxicated because, in his experience as a deputy, motorists do not operate vehicles in the fashion he had just observed while sober.  (Def.'s 56.1 ¶ 24; Pl.'s 56.1 Resp. ¶ 24.)

Defendants aver, and Plaintiff disputes, that throughout the pursuit, there was no vehicular or pedestrian traffic traveling along the route.  (*See, e.g.*, Defs.' 56.1 ¶¶ 26–27, 33–34, 36–38, 40–42, 53–54; Pl.'s 56.1 Resp. ¶¶ 26–27, 33–34, 36–38, 40–42, 53–54.)[4]

---

[3] Plaintiff disputes the fact that Basler activated his lights and siren simultaneously, but otherwise agrees with the statement.  (Pl.'s 56.1 Resp. ¶ 17.)

[4] In support of the opposition to summary judgment, Plaintiff submits the Affidavit of Joshua Brill ("Brill"), the passenger in Besze's vehicle, which indicates that Brill "saw between [12] and [20] other cars on the road" during the pursuit.  (Aff. of Bill Greenberg Ex. Q.)

While following Besze, Basler radioed headquarters with Besze's license plate number in an attempt to identify the owner of the vehicle, but the Besze vehicle had a California license plate and it did not match the vehicle's registration.  (Defs.' 56.1 ¶¶ 66–67; Pl.'s 56.1 Resp. ¶¶ 66–67.)  Sergeant Neil Stuart ("Stuart") obtained permission to set up stop sticks on Raymond Avenue at its intersection with Collegeview Avenue in an effort to prevent Besze from continuing to flee from Basler.  (Defs.' 56.1 ¶ 97; Pl.'s 56.1 Resp. ¶ 97.)  At one point during the pursuit, Besze's vehicle attained a speed of 72 mph on College Avenue.  (Defs.' 56.1 ¶ 79; Pl.'s 56.1 Resp. ¶ 79.)  It is undisputed that the pursuit lasted about 10 minutes and covered approximately nine miles.  (Defs.' 56.1 ¶ 103; Pl.'s 56.1 Resp. ¶ 103.)

At the intersection of North Cherry Street and Main Street in Poughkeepsie, Plaintiff's vehicle was struck by Besze's vehicle.  (*See* Aff. of Bill Greenberg Ex. K (Dkt. No. 41).)  Plaintiff sustained a cerebral concussion and traumatic brain injury as a result of the accident.  (Pl.'s 56.1 ¶ 2.)  After the collision, Besze was arrested and charged with, among other offenses, aggravated vehicular assault, a C Felony, in violation of Penal Law § 120.04-a(3), Driving While Under the Influence of Alcohol, an E Felony, in violation of Vehicle and Traffic Law §§ 1192(3) and 1193(1)(c)(i), and two counts of Unlawful Fleeing a Police Officer in a Motor Vehicle, E Felonies, in violation of Penal Law § 270.30, all of which Besze admitted at his plea hearing.  (Defs.' 56.1 ¶¶ 100–02; Pl.'s 56.1 Resp. ¶¶ 100–02.)

B.  Procedural History

Plaintiff filed his Complaint on August 25, 2014, (Dkt. No. 1), and Defendants answered on October 30, 2014, (Dkt. No. 5).  On April 29, 2016, Defendants filed their Motion for

---

In his Affidavit, Brill also states that "[a]t one point, . . . Besze did donuts in the roadway to antagonize police."  (*Id*.)

It bears noting that Brill does not contradict Basler's belief that Besze was intoxicated.

Summary Judgment and accompanying papers.  (Dkt. Nos. 32–37.)  Plaintiff filed his opposition and accompanying papers on June 5, 2016, (Dkt. Nos. 40–42), and filed an amended opposition on June 9, 2016, (Dkt. Nos. 44–46).  Defendants filed an amended Rule 56.1 Statement on June 20, 2016.  (Dkt. No. 47.)  Defendants filed their reply and accompanying affidavit on June 24, 2016.  (Dkt. Nos. 50–51.)

On June 24, 2016, Defendants filed a Motion To Strike the Affidavit of Gareth Jones and accompanying papers.  (Dkt. Nos. 52–54.)  On July 21, 2016, Plaintiff filed an opposition to the Motion To Strike.  (Dkt. No. 57.)  Defendants filed a reply on August 8, 2016.  (Dkt. No. 58.)

The Court held oral argument on the Motions on January 31, 2017.  (Dkt. (minute entry for Jan. 31, 2017).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse

Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to

create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to

'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v.

County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere

allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941,

2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing,

inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

      "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's

goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech.

*Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### B.   Analysis

"Because a decision on the motion to strike may affect [a] movant's ability to prevail on summary judgment, it is appropriate to consider the Motion [T]o Strike prior to the . . . Motion for Summary Judgment." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) (alteration and internal quotation marks omitted), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Accordingly, the Court first addresses Defendants' Motion To Strike and then turns to the Motion for Summary Judgment.

### 1.  Motion To Strike

As part of his Expert Disclosures, Plaintiff submitted the Expert Report of Gareth Jones ("Jones"), dated October 18, 2015 (the "Report"). (*See* Aff. of David L. Posner in Supp. of Mot. To Strike Ex. A ("Jones Report") (Dkt. No. 53).) The Report states that Jones has "been asked to provide a preliminary report of no more than [three] pages, summarizing [his] opinion." (*Id.* at 1.) By its own terms, the Report provides a "boiled down . . . analysis" "[i]n order to be brief," (*id.* at 5), and states that Jones "may revise this opinion should further information be made available," (*id.* at 7). The Report is seven single-spaced pages.

On June 5, 2016, more than seven months after the submission of the Report, Plaintiff submitted the Affidavit of Gareth Jones, dated June 2, 2016 (the "Affidavit") as an exhibit to Plaintiff's opposition to the Motion for Summary Judgment. (*See* Aff. of Bill Greenberg Ex. O ("Jones Aff.").) The Affidavit is 42 double-spaced pages and attaches a curriculum vitae and materials upon which Jones relied.

Defendants move to strike the Affidavit on the basis that Jones' earlier Report failed to adhere to the requirements of Federal Rule of Civil Procedure 26, warranting preclusion of opinions offered by Jones, including the Affidavit. (*See* Mem. of Law in Supp. of Mot. To Strike Jones' Aff. ("Mot. To Strike") 1–6 (Dkt. No. 54).) Defendants also argue that the Affidavit should be stricken because it contradicts the Report and is not the proper subject of expert opinion. (*See id.* at 6–9.)

Federal Rule of Civil Procedure 26(a)(2) addresses disclosure of expert testimony and provides:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
>> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>>
>> (ii) the facts or data considered by the witness in forming them;
>>
>> (iii) any exhibits that will be used to summarize or support them;
>>
>> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>>
>> (v) a list of all other cases in which, during the previous [four] years, the witness testified as an expert at trial or by deposition; and
>>
>> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Notwithstanding the clear requirements of Rule 26(a)(2), the Report is deficient in a number of ways. First, the Report is unsigned. Second, the Report fails to include "a list of all publications authored in the previous 10 years" and "a list of all other cases in which, during the previous [four] years, the witness testified as an expert at trial or by deposition." *Id.* While the Report does include a list of publications, speaking engagements, and presentations, the Affidavit, submitted more than seven months later, lists additional publications and speaking engagements,

each pre-dating the Report.  (*Compare* Aff. of David L. Posner in Supp. of Mot. To Strike Ex. B, at 1–4 *with* Aff. of Bill Greenberg Suppl. Ex. O, at 11–23.)  Additionally, the Report fails to list the cases in which Jones served as an expert witness or the dates of such work.  Finally, and most importantly, the Report does not provide "a complete statement of all opinions [Jones] will express," or the "reasons for" such opinions.  Fed. R. Civ. P. 26(a)(2).  This is evident from the preface in the Report, which makes clear that it only is a summary of Jones' opinions.

Rule 37(c) instructs that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Plaintiff has not provided an amended report to cure the deficiencies in the Report, nor has Plaintiff presented substantial justification for the failure to disclose or supplement the information absent from the Report.  Indeed, Plaintiff's opposition to the Motion To Strike does not address Defendants' arguments as to the missing signature or amended list of publications.  (*See generally* Mem. of Law in Opp'n of Mot. To Strike Garth Jones Aff. ("Mot. To Strike Opp'n") (Dkt. No. 57).)[5]

While "preclusion is a harsh remedy that should be imposed only in rare situations," *New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015) (alteration and internal quotation marks omitted), here, where Plaintiff makes no attempt to amend the Report, justify or assert the harmlessness of the omissions, or even address Defendants' arguments regarding the failure to comply with Rule 26, preclusion is appropriate.  While the Court could preclude the Report itself due to its technical deficiencies noted above, the Court

---

[5] Plaintiff's opposition to Defendants' Motion To Strike misspells the expert's name as "Garth Jones," rather than "Gareth Jones."  (*See* Mot. To Strike Opp'n.)

finds the Jones Affidavit more troubling in its abuse of Rule 26.[6]  The Affidavit contains

substantially more information than the Report.  For example, it is only in the Affidavit that

Jones addresses Basler's failure to report Besze's suspected intoxication, (*see* Aff. ¶¶ 23–24, 32),

the application of the "red mist" theory, (*see id.* ¶¶ 25–26), Sergeant Pearsall's post-pursuit

memorandum, (*see id.* ¶ 40), the condition of the inside rear tires of Besze's truck, (*see id.* ¶ 41),

and statistics from the U.S. Department of Justice, the Minnesota Department of Public Safety,

and the Bureau of Research and Development of the Pennsylvania State Police, (*see id.* ¶¶ 46–

47).

     The Court therefore finds it is appropriate to preclude the Jones Affidavit as it goes well

beyond the information contained in the Jones Report.  *See, e.g.*, *Hunt v. CNH Am. LLC*, 857 F.

Supp. 2d 320, 339 (W.D.N.Y. 2012) ("To the extent that [the supplemental expert report]

contains new information, that exceeds the scope of [the initial] report and deposition testimony,

as opposed to merely restating [the expert's] earlier opinions, the [c]ourt agrees that it

violates [Rule] 26(a)(2)(B), and is subject to exclusion pursuant to [Rule] 37(c)(1)."), *aff'd*, 511

F. App'x 43 (2d Cir. 2013); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 06-CV-1352, 2009

WL 5873112, at *3 (D. Conn. Feb. 23, 2009) (report and recommendation) ("[A party's] duty to

supplement its initial expert report does not arise when it seeks to bolster its earlier submission,

but rather, arises only if the expert subsequently learns of information that was previously

unknown or unavailable, that renders information previously provided in an initial report

inaccurate or misleading because it was incomplete." (emphasis omitted) (alterations omitted));

*Sandata v. Techs., Inc. v. Infocrossing, Inc.*, Nos. 05-CV-9546, 06-CV-1896, 2007 WL 4157163,

---

    [6] Moreover, Defendants' Motion To Strike seeks only to preclude the Jones Affidavit and
not the Jones Report.

at *4–5 (S.D.N.Y. Nov. 16, 2007) (report and recommendation) (precluding supplemental expert

reports pursuant to Rule 37 because "[i]t should be assumed that at the time an expert issues his

report, that report reflects his full knowledge and complete opinions on the issues for which his

opinion has been sought"); *Revlon Consumer Prods. Corp. v. Estee Lauder Cos.*, No. 00-CV-

5960, 2003 WL 21751833, at *4 (S.D.N.Y. July 30, 2003) (granting the defendants' motion to

strike "those portions of [the expert's affidavit] that go beyond his preliminary report, rebuttal

report and deposition testimony").[7]

Accordingly, Defendants' Motion To Strike the Affidavit is granted and the Court does

not consider the Affidavit in its decision on the instant Motion for Summary Judgment.[8]

### 2.  Motion for Summary Judgment

Defendants assert that in his pursuit of Besze, Basler operated his vehicle according to

"DCSO policy, the law[,] and commonsense," (Defs.' Mem. of Law in Supp. of Summ. J.

("Defs.' Mem.") 9 (Dkt. No. 37)), and that "Besze's reckless and drunk operation of his vehicle

was the sole cause of this traffic accident," (*id.* at 10).  In response, Plaintiff contends that "[h]e

has put forth sufficient facts for a jury to find that his grave injuries resulted from the tortious

conduct of Basler during the [p]ursuit, which occurred under the supervision of Pearsall."  (Pl.'s

Mem. of Law in Opp'n to Defs.' Mot. For Summ. J. ("Pl.'s Opp'n") 6 (Dkt. No. 45).)

---

[7] As the Court finds preclusion is warranted pursuant to Rule 26(a)(2)(B), the Court declines to address Defendants' contention that the Report and Affidavit offer contradictory information.  (*See* Mot. To Strike 6–9.)

[8] While not material to the instant Motion To Strike, the Court also notes that Jones fails to put his opinions in the context of New York law.  Jones worked as a police officer in London, United Kingdom and later became an investigator with the Attorney General in Ontario, Canada. (Jones Report 1.)  While Jones asserts that "[a]pproximately two hundred of the cases [he] investigated involved incidents where a vehicle driven by an on-duty police officer was involved in a death or serious injury," there is no suggestion either of the expert submissions are tethered to Vehicle and Traffic Law § 1104, let alone that Jones is familiar with the law.  (*Id.*)

<u>a.  Vehicle and Traffic Law § 1104 and Controlling Case Law</u>

Vehicle and Traffic Law § 1104 provides in relevant part:

> (a) The driver of an authorized emergency vehicle, when involved in an emergency operation, may exercise the privileges set forth in this section, but subject to the conditions herein stated.
> (b) The driver of an authorized emergency vehicle may: . . .
>> 2.  Proceed past a steady red signal, a flashing red signal or a stop sign, but only after slowing down as may be necessary for safe operation;
>> 3. Exceed the maximum speed limits so long as he does not endanger life or property . . . .

Section 1104(e) further states that "[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

In *Saarinen v. Kerr*, 644 N.E.2d 988 (N.Y. 1994), the seminal case on § 1104, the plaintiff sued a defendant driver and the Village of Massena when he was seriously injured as a result of an accident that occurred when the defendant driver hit the plaintiff's vehicle while the defendant was being pursued by a police officer. *Id.* at 989.  The officer, a member of the Village police force, was in his patrol car at 10:00 p.m. when he observed a vehicle that "fish-tailed and squealed its tires as it made a turn onto a Village street." *Id.*  The officer decided to follow the vehicle and saw it "run a stop sign." *Id.*  When the officer activated the emergency lights on his patrol car, the vehicle pulled away and a pursuit ensued. *Id.*  The vehicle turned onto a public road and "drove into the lane for oncoming traffic, passing a red traffic light." *Id.* As the officer reached for his radio, the defendant's vehicle collided with that of the plaintiff. The plaintiff filed an action alleging that the Village "should be held vicariously liable for [the

officer's] lack of due care in pursuing [the defendant's] vehicle and liable for its own negligence in failing adequately to train [the officer] or to adopt an adequate pursuit policy." *Id.*

"Faced squarely with th[e] question of statutory interpretation [of § 1104] for the first time," the New York Court of Appeals held "that a police officer's conduct in pursuing a suspected lawbreaker may not form the basis of civil liability to an injured bystander unless the officer acted *in reckless disregard for the safety of others*." *Id.* at 991 (emphasis added).  The court noted that "[t]his standard demands more than a showing of a lack of due care under the circumstances" and "requires evidence that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and has done so with conscious indifference to the outcome." *Id.* (internal quotation marks omitted).  The court considered that "the common law has long recognized that an emergency situation which leaves little or no time for reflection itself may be a significant circumstance which should enter into the determination of the reasonableness of the choice of action pursued." *Id.* (internal quotation marks omitted).  In commenting on the soundness of the "reckless disregard" standard, the court stated that using the traditional "due care" standard would

> undermine the evident legislative purpose of Vehicle and Traffic Law § 1104, i.e.,
> affording operators of emergency vehicles the freedom to perform their duties
> unhampered by the normal rules of the road . . . [and] would lead to judicial
> "second-guessing" of the many split-second decisions that are made in the field
> under highly pressured conditions.

*Id.* at 992.  The court further found that the threat of "incurring civil liability for what amounts to a mere failure of judgment could deter emergency personnel from acting decisively and taking calculated risks in order to save life or property or to apprehend miscreants." *Id*.  Reversing the Appellate Division, the Court of Appeals ordered that summary judgment be granted to the

Village, concluding that "as a matter of law" the pursuing officer did not "overstep the limits of the statutory qualified privilege." *Id.*

### b. Plaintiff's Claims

Plaintiff argues that there exist questions of triable fact including: 1) whether the traffic and pedestrian volume was too dense at the time to warrant the high speed chase; 2) whether Basler's failure to report Besze's intoxication was reckless; and 3) whether Defendants should have ceased the pursuit before the crash occurred.  (Pl.'s Opp'n 7.)  The Court addresses each issue in turn.

### i. Traffic and Pedestrian Volume

The Parties' main factual dispute concerns the presence of vehicles and pedestrians along the route of the pursuit.  Dutchess County Sheriff's Office ("DCSO") policy on "Office Vehicle Pursuits," which mimics the factors of § 1104, states:

> During an emergency operation, members shall drive with due regard to all persons.  Members shall avoid engaging in, or shall terminate, any emergency operation when conditions indicate that the safety of the officer and/or the community is in jeopardy or as instructed by his/her supervisor.
>
> The officer must constantly evaluate the risks involved in initiating or continuing a pursuit or engaging in an emergency response.  Factors to be considered are:
>
> 1. Reason for the pursuit/seriousness of the incident or charges.
> 2. *Traffic density/pedestrian volume.*
> 3. Weather/road conditions.
> 4. Speed involved.
> 5. Time of day.
> 6. Type of area (business vs. residential).
> 7. Availability of additional police vehicles to assist at the scene or to intercept pursued vehicle.
> 8. Knowledge of the offender's identity/danger to the community if the suspect is not immediately apprehended.

(Aff. of David L. Posner Ex. D ("DCSO Pursuits Policy") 1 (Dkt No. 34) (emphasis added).)

Defendants repeatedly contend that there was no vehicular or pedestrian traffic at the time of the

pursuit.  (*See, e.g.*, Defs.' 56.1 ¶¶ 26–27, 33–34, 36–38, 40–42, 51, 53–54, 58, 62–64, 70–73,

76–78, 82, 86–88, 91, 94–96.)  In response, Plaintiff submits the Affidavit of Joshua Brill

("Brill"), the passenger in Besze's vehicle, who affirms that he "saw between [12] and [20] other

cars on the road" during the 10-minute pursuit.  (*See* Aff. of Bill Greenberg Ex. Q ("Brill Aff.").)

Plaintiff also submits a video from May 10, 2014 depicting the collision, showing

"significant vehicle and pedestrian activity in the area in the minutes preceding the crash."  (Pl.'s

Opp'n 4 (citing Aff. of Bill Greenberg Ex. K ("Collision Video").)  In the two and one-half

minutes leading up to the accident, the video shows "six civilian vehicles, one police vehicle, and

one pedestrian."  (*Id.*; Collision Video.)[9]  The presence of six vehicles over the course of two and

a half minutes simply does not support Plaintiff's contention that there was "*significant* vehicle

and pedestrian activity," (Pl.'s Opp'n 4 (emphasis added)), nor does it speak to the presence of

vehicles or pedestrians throughout the 10-minute pursuit.  Plaintiff also asserts that the video

depicts "a constant stream of traffic and activity" in the upper left corner of the video, (*id.*;

Collision Video), however, the area Plaintiff references is neither the site of the accident, nor on

the route of the pursuit.  Further, there are moments where the upper left hand corner of the video

is devoid of any cars—far from the "constant" nature of traffic Plaintiff suggests.  (*Id.*; Collision

Video.)

Plaintiff also submits "video footage evidence showing that two years and two days from

the date of the accident," 42 cars and three pedestrians were present "on the same exact route at

---

[9] Plaintiff's opposition later asserts that "[j]ust two minutes and forty seconds before the collision, six cars and *three* pedestrians were at the intersection of the crash."  (Pl.'s Opp'n 9.) The video refutes this statement.  (Collision Video.)

the same time of day of the police pursuit." (*See, e.g.*, Pl.'s Resp. 56.1 ¶¶ 26–27, 33–34, 36–38, 40–42, 51, 53–54, 58, 62–64, 70–73, 76–78, 82, 86–88, 91, 94–96 (citing Aff. of Bill Greenberg Ex. H).)  However, it is unclear how the traffic and pedestrian volume two years and two days after the accident has any bearing on the question of the conditions the night of the pursuit.

Additionally, Plaintiff cites to census bureau statistics regarding the population density of the City of Poughkeepsie, (*see* Pl.'s Opp'n 4 ("The City of Poughkeepsie is 5.14 square miles and has a population of 31,000 people.  It has an approximate population density of 6,000 persons per square mile.")), and the fact that "[o]n the night of the collision . . . , a rock concert occurred . . . 2.5 blocks away from the crash . . . [in which] [t]wo hundred people were in attendance," (*see id.*).  Plaintiff provides no indication of how this information is relevant to the question of vehicle and pedestrian traffic.  For instance, Plaintiff does not offer information on how many residents lived along the pursuit route or near the scene of the collision or whether the concert concluded shortly before the time of the accident.

Accepting, as the Court must at this stage, that Plaintiff's account of the traffic volume is accurate and between 12 and 20 vehicles were present on the pursuit route on May 10, 2014 at 12:30 a.m., that would mean that on average, during the 10-minute pursuit, Basler encountered only two vehicles per minute.  Not only does this contradict Plaintiff's account of "significant vehicular and pedestrian activity," (*id.*), but courts have found summary judgment appropriate in situations with vehicular traffic, *see, e.g.*, *Gonzalez v. Zavala*, 931 N.Y.S.2d 396, 397 (App. Div. 2011) (reversing a denial of summary judgment where the officer pursued a motorist who "reached speeds of 70 miles per hour, failed to stop for [nine] red lights, and *swerved in and out of traffic*" (emphasis added)); *Mulligan v. City of New York*, 664 N.Y.S.2d 484, 485 (App. Div. 1997) (affirming summary judgment finding officer was not reckless despite, among other

16

factors, the fact that "other vehicles on the road" had to pull over); *see also Jones v. Albany Cty. Sheriff's Dep't*, 999 N.Y.S.2d 260, 263 (App. Div. 2014) (affirming an order of summary judgment where the plaintiff alleged an officer made a U-turn into "oncoming traffic" in an attempt to assist at the scene of an accident).

More importantly, in *Saarinen*, the Court of Appeals held that although "the possibility of vehicular traffic in the vicinity undoubtedly augmented the risk involved in the course of conduct [the officer] undertook, . . . the risk was one that [the officer] was entitled to take in the interest of stopping a motorist whose conduct on the road presented a clear and immediate threat to public safety." *Saarinen*, 644 N.E.2d at 993.  The motorist's actions in *Saarinen* were akin to Besze's—intoxication, fish-tailing, disregarding traffic signs—such that termination was worse than pursuit. *Id.* at 992.  Additionally, the "wet condition of the roads" in *Saarinen*, a factor not present here, makes the pursuit more dangerous in *Saarinen* than the case at hand. *Id.* at 993. Accordingly, the Court finds that the amount of vehicle and pedestrian traffic does not present an issue of material fact that precludes summary judgment.

### ii.  Failure to Report Besze's Intoxication

Plaintiff contends that there is a "triable issue of fact as to whether it was reckless for Basler to fail to report to [d]ispatch that Besze appeared to be intoxicated" and that "[i]t will be important for the jury to consider [this] fact."  (Pl.'s Opp'n 10.)  Plaintiff separately seems to contend that the very belief that Besze was intoxicated should have been reason enough for Basler to terminate the pursuit of his own accord.  Both arguments are unavailing.

Plaintiff cites no policy—DCSO or otherwise—that requires the pursuing officer to report a driver's possible intoxication.  Nor does Plaintiff point to any case law that considers the dispatch of information (or lack thereof) about the suspected intoxication of the driver of a

pursued vehicle.  Plaintiff's only support for this proposition is the now-stricken Jones Affidavit that asserts:

> Deputy Basler acknowledged that he suspected the operator of the pursu[ed] vehicle to be under the influence of alcohol, though he did not advise anyone of this during the [10] minutes or so he states the pursuit took.  This in and of itself should have been a red flag militating against the high-speed, lengthy pursuit that followed.

(Jones Aff. ¶ 23; *see also id.* ¶ 32 ("[Basler] did not mention [his suspicion Besze was intoxicated] in any radio transmission during the pursuit.").)  Plaintiff's emphasis on the fact that "Pearsall did not have the requisite information properly to manage the police response" is entirely unsupported.  (Pl.'s Opp'n 10.)  The DCSO policy states that a pursuit shall be terminated "[w]hen so ordered by [a] supervisor assigned to the pursuit," (DCSO Pursuits Policy 3), but nowhere in the policy does it require the pursuing officer to supply every piece of information as it is developed during a chase, such as the supposition that the driver is intoxicated, (*see id.* at 2 (noting that "[w]hen a . . . pursuit is initiated, the pursuing officer shall immediately report . . . [the] "[r]eason for pursuit," "[r]oute and direction of travel," "description of pursued vehicle," "[o]ccupant(s) description," "weapons involved, if any," and "[d]irection and areas being approached")).

In support of Plaintiff's contention that there exists a triable issue of fact as to whether Basler's failure to cease the pursuit "given that Besze was drunk" was reckless, Plaintiff offers the opinion of Jones providing:

> It is good practice in police pursuits that where it is suspected that the operator of the motor vehicle is impaired, either from the ingestion of alcohol or other substances, the pursuit of that vehicle, particularly a high-speed pursuit, increases the danger created by a pursuit.[10]  At the point that there is suspicion that the pursued vehicle is being driven by an impaired driver, a pursuit should generally be terminated, unless the magnitude and threat to public safety of allowing the

---

[10] The Court notes that here, Jones does not actually opine what "it is good practice" to do.  (Jones Aff. ¶ 24.)

> suspect to escape outweighs the risk to public safety in allowing [the] pursuit to continue. A relatively minor offen[s]e does not justify a [10]-minute high-speed pursuit into a built up area, particularly where it is suspected that the operator of the pursued vehicle may be impaired.

(Jones Aff. ¶ 24 (footnote added).) Setting aside the admissibility of the Affidavit, the assertion that intoxication "increases the danger created by a pursuit," (*id.*), does not speak to whether this condition presents "an *extraordinary* danger to the officer or the public" justifying the need to terminate the pursuit under the DCSO policy, (DCSO Pursuits Policy 3 (emphasis added)). In fact, the case law is to the contrary. Borrowing from one decision, "[w]hile the intoxication of [Besze] increased the hazards of the pursuit, it also increased the need for his immediate apprehension." *Jessop v. City of Niagara Falls*, 669 N.Y.S.2d 110, 112 (App. Div. 1998); *see also Saarinen*, 644 N.E.2d at 992 (noting how the pursued driver's conduct suggested he was "intoxicated," further justifying the pursuit). The fact remains that Pearsall, Basler's supervisor did not instruct Basler to terminate the pursuit. Thus, the Court finds that Basler's failure to report Besze's apparent intoxication and failure to terminate the pursuit on such grounds was not reckless, and therefore does not create a triable issue of fact.

### iii.  Failure to Terminate the Pursuit

Plaintiff asserts that there "exists a triable issue of fact as to whether a 10-minute chase was reckless given that Besze was drunk, speeding, disregarding stop signs, and disregarding red lights." (Pl.'s Opp'n 10.) Plaintiff cites only to the Jones Affidavit to support the contention that "it was predictable that the chase would end up in a collision." (*Id.* (citing Jones Aff. ¶ 20).)

According to the DCSO Pursuits Policy, a pursuit shall be terminated under the following conditions:

> 1. When circumstances develop which present extraordinary danger to the officer or the public (pursuing officer or supervisory discretion).

2. Under those circumstances wherein the offender can be identified and an arrest made at a later time without risk of creating an unreasonable danger to the public.

3. When so ordered by supervisor assigned to the pursuit.

4. The pursued vehicle's location is no longer known by pursuing officers.

5. Radio contact is lost.

(DCSO Pursuits Policy 3.)  Plaintiff does not dispute Defendants' contention that "[r]adio contract was not lost; Besze's location was never unknown; [and] Pearsall did not direct Basler to stop."  (Defs.' Mem. 9.)  The Parties dispute the application of the second condition—whether "the offender can be identified and an arrest made at a later time without risk of creating an unreasonable danger to the public."  (DCSO Pursuits Policy 3.)  Defendants argue that because Besze's California license plate "did not match the vehicle's registration, there was no opportunity to identify the offender and make the arrest later."  (Defs.' Mem. 9.)  Plaintiff asserts that proper and timely identification of the vehicle, even with out-of-state plates "would be [a] . . . basis to terminate the dangerous pursuit."  (Pl.'s Opp'n 3.)  Plaintiff's only support for this statement is the Jones Affidavit, which states that "knowledge of a license plate number, albeit from out of [s]tate . . . may potentially lead to the identity of the operator and his arrest and prosecution without any risk to the public."  (Jones Aff. ¶ 24.)  For the reasons stated *supra*, the Court declines to consider the Affidavit.  But even if it did, it would offer little help to Plaintiff, as it involves pure speculation.  More sensical is the notion that from Basler's perspective, it was far from clear that he ever would have been able to identify the driver of the vehicle where the license plate did not match the vehicle's registration.

As to the first condition under DCSO Policy, Plaintiff does not directly identify circumstances which "present[ed] extraordinary danger to the officer or the public," (DCSO Pursuits Policy 3), but seems to suggest that Besze's suspected intoxication and speed of 72 mph, which Basler failed to report to Pearsall, were circumstances that would have warranted

termination, (*see* Pl.'s Opp'n 10).  Again, Plaintiff's only proffered support is the Jones Affidavit.

While the Court acknowledges that the facts of the chase undeniably presented some danger to Basler, Besze, his passenger, and fellow drivers and pedestrians, Basler's decision to continue the pursuit was not only reasonable, but "[h]aving observed erratic and dangerous driving on the part of [Besze], Officer [Basler] was *duty-bound* to investigate, using all reasonable means, including pursuit, to stop the lawless vehicle's forward progress."  *Saarinen*, 644 N.E.2d at 992 (emphasis added); *see also Martin v. Miller*, 680 N.Y.S.2d 300, 301 (App. Div. 1998) (granting summary judgment in part because the pursuing officer was "duty bound to investigate" a reckless driver); *Jessop*, 669 N.Y.S.2d at 112 (reversing denial of summary judgment, holding that the intoxication of the pursued driver "increased the need for his immediate apprehension").

Finally, as to Plaintiff's contention that the length of the pursuit was itself inherently dangerous, Plaintiff offers no case law—and the Court is aware of none—that suggests there is a temporal limit at which point a pursuit must be halted.  Indeed, no court has explicitly deemed length of pursuit a relevant factor in determining whether a police chase was reckless under § 1104.  *See Greenawalt v. Village of Cambridge*, 888 N.Y.S.2d 295, 296–97 (App. Div. 2009) (affirming a grant of summary judgment that the defendant police officers' conduct did not exhibit "reckless disregard for the safety of others" and was not a proximate cause of the plaintiff's injuries during an approximately 10-minute chase where the vehicles "reached speeds nearing 90 miles per hour" (internal quotation marks omitted)); *King v. Village of Cobleskill*, 654 N.Y.S.2d 439, 440 (App. Div. 1997) (affirming a grant of summary judgment that an officer's

conduct did not rise to the level of "reckless disregard for the safety of others" during a five-mile, high-speed pursuit in the rain, on a road with a "sharp curve" (emphasis omitted)).

Plaintiff asserts that in addition to the issues discussed above, "numerous issues of disputed fact exist . . . regarding the 'reason for the pursuit at the outset/seriousness of the incident or charges'; the 'traffic/density pedestrian volume'; and 'the knowledge of the offender's identity/danger to the community if the suspect is not immediately apprehended.'" (Pl.'s Opp'n 11.)  Plaintiff does not indicate what these disputed factual issues are, but contends in conclusory fashion that "[i]t is the province of the jury, not this Court, to make these factual findings."  (*Id.*)  Here, the material facts are not in dispute, or the Court has assumed Plaintiff's version of the facts.[11]  And, in light of these facts, it is within the Court's province to determine, as it does, that as a matter of law Defendants are entitled to summary judgment because of the lack of evidence that Basler intentionally committed an act of "an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow" and did so "with conscious indifference to the outcome."  *Saarinen*, 644 N.E.2d at 991 (internal quotation marks omitted).  Indeed, numerous courts faced with cases involving police pursuits have found summary judgment appropriate in similar circumstances.  *See, e.g.*, *Nurse v. City of New York*, 867 N.Y.S.2d 486, 488 (App. Div. 2008) (reversing a denial of summary judgment and finding the defendants-appellants "established their prima facie entitlement to judgment as a matter of law by demonstrating that the police officers involved in the pursuit . . . did not act with reckless disregard for the safety of others" and that "the proximate cause of the accident was the independent recklessness of the driver . . . and not the

---

[11] For example, the Court assumes Plaintiff's version about the volume of traffic that night, but Plaintiff does not offer an alternative version of the offender's danger to the community, other than that presented by Defendants.

police officers' conduct in initiating the pursuit"); *Pacelli v. City of Syracuse*, 760 N.Y.S.2d 790, 791 (App. Div. 2003) (reversing an order denying the defendant's motion for summary judgment and finding that the "plaintiff failed to raise an issue of fact whether the police disregarded an obvious risk that was so great as to make it highly probable that harm would follow and that they did so with conscious indifference to the outcome" (internal quotation marks omitted)); *Martin*, 680 N.Y.S.2d at 302 (reversing an order denying summary judgment finding that the city and police officer were not liable for injuries sustained by an innocent bystander during a police pursuit; *Mullane v. City of Amsterdam*, 622 N.Y.S.2d 346, 347 (App. Div. 1995) (affirming a grant of summary judgment for the defendants and finding "the proximate cause of the accident was [the driver's] erratic and improper operation of his vehicle, not the manner in which the police officer conducted the pursuit").

In support of his claims that Basler and Pearsall acted recklessly under § 1104 and that consequently, the Court should deny summary judgment, Plaintiff cites a single case, *Greges v. City of White Plains*, 200 F. Supp. 2d 302 (S.D.N.Y. 2002). Plaintiff contends *Greges* is "instructive," but even the three sentences Plaintiff cites make the facts readily distinguishable from those in the case at hand. (Pl.'s Opp'n 11.) In *Greges*, the officers claimed they never saw the suspect vehicle while in pursuit and were chasing the vehicle at approximately 90 mph on the dangerous curves of the Bronx River Parkway during heavy rain. *See* 200 F. Supp. at 309. Further, the suspect's car was equipped with LoJack, so that it could be located at a later time. *Id.* None of these conditions is present in the instant case.

Ultimately, Plaintiff's arguments render § 1104 toothless. It is unclear under what circumstances an officer could pursue an intoxicated driver late in the evening in a suburban/rural setting on dry roads without violating DCSO policy and New York State law or

exposing themselves to tort liability. As the Court of Appeals has emphasized, it is dangerous

for courts, in hindsight, to second-guess the "decisions that are made in the field under highly

pressured conditions" and impose liability upon "emergency personnel [who] act[] decisively

and tak[e] calculated risks in order to save life or property or to apprehend miscreants."

*Saarinen*, 644 N.E.2d at 992. Consistent with this directive, and based on the record, the Court

will not second-guess the officers here.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Strike and Motion for

Summary Judgment. The Clerk of Court is respectfully directed to terminate the pending

Motions, (Dkt. Nos. 32, 52), enter judgment for Defendants, and close this case.

SO ORDERED.

Dated:         March **9** , 2017
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

24